**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| BERMAN DE PAZ GONZALEZ AND | § | |
| EMERITA MARTINEZ-TORRES, | § | |
| INDIVIDUALLY AND AS HEIRS, | § | |
| AND ON BEHALF OF THE ESTATE OF | § | |
| BERMAN DE PAZ-MARTINEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | NO. 4:20-CV-0072-A |
| | § | |
| THERESE M. DUANE, *ET AL.,* | § | |
| | § | |
| Defendants. | § | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONSE TO DEFENDANT**
**DUANE'S SECOND MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs, BERMAN DE PAZ GONZALEZ and EMERITA MARTINEZ-TORRES, Individually and as Heirs of BERMAN DE PAZ-MARTINEZ, hereby file this brief in support of their response to the second motion for summary judgment [Dkt. 79] filed by the remaining Defendant, THERESE DUANE, M.D., on July 27, 2022.

1

# CONTENTS

I.  SUMMARY OF THE ARGUMENT ................................................................................. 1

II.  Summary judgment standards ................................................................................. 4

III.  ARGUMENT ......................................................................................................... 5

   A.  Dr. Duane has failed to show that she is entitled to summary judgment on Plaintiffs' § 1983 claim as a matter of law. ................................................................................... 5

      1.  Evidence indicates that Dr. Duane violated the Constitution by ordering extubation without the Plaintiffs' informed consent. ................................................................... 8

      2.  Evidence indicates that Dr. Duane violated the Constitution by ordering—in advance—that Plaintiffs' son would not be reintubated if extubation was not tolerated. .... 12

      3.  Although unnecessary to establish a constitutional violation, evidence indicates that Dr. Duane unilateral decision to extubate (and not re-intube) was intended to hasten the death of the Plaintiffs' son, without consent. ...................................................... 16

   B.  Dr. Duane has failed to establish that she is entitled to summary judgment on the element of damages. ................................................................................................ 19

   C.  Dr. Duane has failed to show that she is entitled to summary judgment on Plaintiffs' § 1983 claim as a matter of law. ................................................................................. 20

      1.  Dr. Duane has failed to demonstrate as a matter of law that she is a person who can invoke the affirmative defense of qualified immunity. ........................................... 21

      2.  Dr. Duane has failed to invoke the defense, as she has not demonstrated as a matter of law that she was acting within the scope of discretionary authority. .................................. 27

      3.  Even if Dr. Duane has invoked the defense of qualified immunity, she has failed to establish the defense as a matter of law. ............................................................. 28

   D.  Alternatively, if the motion is not denied, the Court should exercise its discretion to deny summary judgment and proceed to trial. .......................................................... 29

IV.  CONCLUSION .................................................................................................... 31

CERTIFICATE OF SERVICE ..................................................................................... 31

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………..   4-5

*Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309 (5th Cir. 2019)………………………   28

*Cleveland Bd. of Educ. v. Loudermill* ,470 U.S. 532(1985)………………………..   6

*Cronen v. Tex. Dep't of Human Servs*., 977 F.2d 934 (5th Cir. 1992)…………….   27-28

*Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261 (1990). …………………  *passim*

*Daniels v. Williams*, 474 U.S. 327 (1986)……………………………………………   5

*Dethrow v. Parkland Health Hospital System*, 204 F.R.D. 102 (N.D. Tex. 2001)
(Fitzwater, J.) …………………………………………………………………………   4

*Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533 (5th Cir. 2012)…………………..   5, 30

*Garris v. Rowland*, 678 F.2d 1264 (5th Cir.1982).  …………………………….   27

*Gasca v. Lucio*, No. 1:20-cv-160, 2021 U.S. Dist. LEXIS 176051 (S.D. Tex.
2021)………………………………………………………………………………..   23

*Hale v. Fish*, 899 F.2d 390 (5th Cir. 1990). ……………………………………….   20

*Kohler v. Johnson*, 396 F. App'x 158 (5th Cir. 2010)………………………………   20

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)…………………………………   20

*Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009)………………………………   5

*Marcus v. St. Paul Fire & Marine Ins. Co*., 651 F.2d 379 (5th Cir. 1981)…………   30

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986)…….   5

*McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012)…………………………………..   23

*Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)…………..………….   19

*Pasco v. Knoblauch*, 223 F. App'x 319 (5th Cir. 2007)……………………………   30

*Perniciaro v. Lea*, 901 F.3d 241 (5th Cir. 2018)…………………………………..   21

*Richardson v. McKnight*, 521 U.S. 399 (1997).  ………………………………   21, 23, 26

*Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163 (10th Cir. 2005)……………………………………………………………….. 23

*Sanchez v. Oliver*, 995 F.3d 461 (5th Cir. 2021). ………………………………… 21-25

*Smith v. Wade*, 461 U.S. 30 (1983)………………………………………………… 20

*Tanner v. McMurray*, 989 F.3d 860 (10th Cir. 2021)…………………………… 23, 27

*Taylor v. Riojas,* 141 S. Ct. 52 (2020)……………………………………………… 29

*Wyatt v. Cole,* 504 U.S. 158 (1992)………………………………………………… 21

*Wynn v. Harris Cty*., No. 4:18-CV-04848, 2021 U.S. Dist. LEXIS 160553 (S.D. Tex. 2021)……………………………………………………………………….. 22

**Federal Statutes**

42 U.S.C. § 1983…………………………………………...……………….. *passim*

**Federal Rules**

Fed. R. Civ. P.  56(a)…………………………………………………………….. 4, 29

## I.    <u>SUMMARY OF THE ARGUMENT</u>

The official position of Dr. Duane in this action is that she—and all physicians—have the unilateral right to make a treatment decision involving invasive life-support equipment without the consent of their patients .  .  . even when that treatment admittedly carries a **twenty-five percent chance of death**.

That is exactly what happened in this case, and the Plaintiffs' deceased son bore the cost of decision.  If this were a medical negligence case, there would be no doubt that Dr. Duane was at least negligent, as post-mortem investigations (on a much more limited record) determined that Dr. Duane's care was "inappropriate" and did not support the course of treatment.  But this is a due process case, in which a violation does not occur because a physician makes a *poor* decision, but rather because the physician usurped the decision-making process at all.

As explained in prior briefing, the Supreme Court has recognized life and liberty interests in end-of-life decisions, which derive in large part from the right of a person to make his own medical decisions (either directly or through a surrogate).  Here, Plaintiffs' deceased son had been diagnosed (rightly or wrongly) as being terminal, the treatment decision involved the son's bodily integrity (physical removal of a breathing tube), and carried a substantial risk of *immediate* death (at least twenty-five percent, and perhaps much higher).  This decision at issue falls squarely within the protections recognized in *Cruzan* and *T.L.* (as well as the laws of the state of Texas), and Dr. Duane was required to obtain the parents' consent or otherwise provide due process satisfying the state's role as *parens patrie* of incompetents in government care.

The record shows that Dr. Duane did not do so.  While Dr. Duane asserts that the she consulted with Mr. De Paz Sr. (the deceased's father), Mr. De Paz makes clear that she did not

1

inform him of the risks involved *or* ask for his consent.  Furthermore, this is consistent with Dr. Duane's own evidence, which admits that: (1) the Plaintiffs had always stated that they did not want their son taken off the breathing machine,; (2) they did not want treatment shifted to "comfort measures"; (3) they wanted more time before making any decision to do so; (4) Dr. Duane herself did not tell Mr. De Paz Sr. that he had a right to object to extubation; and (5) Dr. Duane believed she had the sole right to make the decision and intended to do so regardless of any objections.  Accordingly, this evidence, standing alone, is sufficient to establish that Dr. Duane intentionally violated the right to due process (or at least creates fact issues for a jury). *See infra* § III(A)(1).

The decision to extubate, however, was only one part of Dr. Duane's unilateral decision that led to the son's immediate death.  In addition, Dr. Duane simultaneously ordered that the son would not be re-intubated if the extubation was unsuccessful, despite re-intubations being the normal protocol.  Dr. Duane does not dispute that re-intubation is the proper procedure in such circumstances.  Instead, she argues that she was prohibited from re-intubating due to a do-not-resuscitate order (DNR).  However, evidence indicates that: (1) no such order existed; (2) any such order would have been rescinded, at least as to ventilation, by subsequent statements of the Plaintiffs (including the father's statements *immediately* before extubation; and (3) would not have applied until the son actually entered cardiac arrest.

To the contrary, medical records indicate that Dr. Duane made the decision not to re-intubate *before* the extubation began.  Indeed, she made the decision not to allow re-intubation *before* she had even received the test numbers ("RSBI" numbers) on which she purportedly based the decision to extubate.  Furthermore, the medical records indicate that the son did not immediately stop breathing entirely; rather, he suffered "hypoxia"  (inadequate oxygen that

caused his organs to shut down) within the first minute after extubation.  Although his oxygen levels rose after that, they remained inadequate—with the son finally dying between ten and eighteen minutes after extubation—all while the hospital's staff was prohibited from re-intubating due to Dr. Duane's order.

Finally, since due process is violated by the very act of a unilateral decision by a physician, Plaintiffs need not prove that Dr. Duane actually intended for the son to die. However, there is ample evidence for a jury to support such a finding.  While Dr. Duane asserts that she extubated for the son's benefit, a jury could determine that her purported reasons (a potential future risk of a tracheostomy) are pretextual when compared to *a twenty-five percent risk of immediate death*, particularly when there is no discussion of a tracheostomy in the medical records.  Instead, a jury could focus on other evidence in the record indicating that she intended to "allow a natural death" and "would only provide "comfort measures," despite the refusal of the Plaintiffs to agree to that course of treatment.  Or a jury might decide that Dr. Duane simply wanted remove a terminal patient from her ICU, by forcing an immediate decision between life and death.   In any event, Dr. Duane's assertions are belied by facts such as: (1) the timing of the decision, since medical records indicate that Dr. Duane decided to extubate (and not to reintubate) *before* receiving notice of the RSBI parameters on which her decision was purportedly based; and (2) by using the hospital's procedure for complete withdrawal of care (*i.e.* for "comfort" patients) rather than for patient subject to continuing care.

In fact, a jury need look no further that Dr. Duane's own statements to determine that her goal was (to paraphrase Paul McCartney) to force an immediate, binary decision to "live [or] let die."

3

Although Dr. Duane makes other arguments (regarding damages and qualified immunity), all are resolved by the foregoing facts. A jury could determine that Dr. Duane violated the life and liberty interest protected by the Due Process Clause of the Constitution, and that she did so intentionally (or at least recklessly). And, if a jury does so, then Dr. Duane's remaining arguments evaporate. In any event, the issues are for a jury to decide, and summary judgment must be denied.

## II.   <u>SUMMARY JUDGMENT STANDARDS</u>

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden to show that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In order to meet this burden, the movant must identify each claim or defense, concisely state the elements of each claim or defense, and cite to admissible evidence showing that the non-movant cannot produce evidence to establish a fact in dispute as to each claim or defense. *See* Fed. R. Civ. P. 56(a), (c); LR 56.3(a). Moreover, the movant must raise all of its grounds for summary judgment in its initial motion; unless directed by the presiding judge, the movant may not file more than one motion for summary judgment, raise new arguments in a reply brief, or submit new evidence in support of its reply brief. *See* LR 56.2(b), 56.5(c), 56.6(b)(1), 56.7; *Dethrow v. Parkland Health Hospital System*, 204 F.R.D. 102, 103-04 (N.D. Tex. 2001) (Fitzwater, J.); *see also Anderson*, 477 U.S. at 256 (placing initial burden on moving party to show absence of fact issues).

In making its determination, the Court must view all disputed facts and draw all reasonable inferences in the light most favorable to Plaintiff. *See Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009). If the record, with all facts and inferences taken in Plaintiff's

4

favor, could lead a rational trier of fact to find for the non-moving party, then summary judgment must be denied. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

In any event, "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Firman v. Life Ins. Co. of N. Am.*, 685 F.3d 533, 538 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III.   <u>ARGUMENT</u>

### A.     **Dr. Duane has failed to show that she is entitled to summary judgment on Plaintiffs' § 1983 claim as a matter of law.**

Like the Supreme Court and the Fort Worth Court of Appeals, this Court has previously determined that patients have both life and liberty interests (bodily integrity, consent to medical treatment) in end-of-life decisions.

> Supreme Court precedent at the time made clear that end of life decisions are subject to due process. <u>See, e.g., Cruzan by Cruzan v. Director, Mo. Dep't of Health</u>, 497 U.S. 261 (1990). "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986) (citing cases). That the due process clause was intended to secure the individual from the arbitrary exercise of the powers of government is a "traditional and common-sense notion." Id. And, it has long been recognized that an essential principle of due process is that a deprivation of life, liberty, or property must be preceded by notice and an opportunity for hearing appropriate to the nature of the case. <u>Cleveland Bd. of Educ. v. Loudermill</u>,470 U.S. 532, 542 (1985).

*See* Order signed March 11, 2022 [Doc. 75] at 16-17. Dr. Duane did not seek an interlocutory appeal of that decision, and the current motion does not appear to challenge the Court's

conclusion on this issue. To the extent is could be construed as doing so, Plaintiffs simply refer the Court to the multiple, prior briefs on the issue.

Furthermore, Dr. Duane does not contend that the Plaintiffs gave informed consent for the withdrawal of life support for their son.  While she asserts that the consulted with the family regarding extubation, her own statements (even if believed) make clear that she did not seek their consent, and the medical records conclusively establish that the family consistently opposed withdrawal of the ventilator (including the father's "begging" and "crying" in her presence at the time of extubation).

Rather, Dr. Duane contends that the principles of *Cruzan* and *T.L.* are limited to cases in which a physician *knows* the treatment decision will result in immediate death.  In turn, she contends that her unilateral decision was simply a medical decision for the *benefit* of Plaintiffs' son, and that no consent is required . . . even if the medical  decision is expected to result in death at least twenty-five percent of the time.

Dr. Duane's assertion is appalling, particularly since her argument would apply not only to this case, but to any case in which a patient requires intubation due to reduced oxygen (or "hypoxia")—which, since the beginning of the Covid-19 pandemic, have numbered in the tens or hundreds of thousands. More importantly, it is contrary to the dictates of *Cruzan* and *T.L.*

In *Cruzan*, the parties agreed that the treatment at issue would eventually end the patients life, but not immediately.  More importantly, the Court's reasoning did not depend on any certainty regarding that fact.  Even as to the interest in life, the Court's rationale was based in large part on the "risks" associated with various treatments or non-treatments:

> But not only does the standard of proof reflect the importance of a particular adjudication, it also serves as "a societal judgment about how the **risk of error** should be distributed between the litigants."  The more stringent the burden of proof a party must bear, the more that party bears the **risk of an erroneous**

6

**decision**. We believe that Missouri may permissibly place an **increased risk of an erroneous decision** on those seeking to terminate an incompetent individual's life-sustaining treatment. An erroneous decision not to terminate results in a maintenance of the status quo; **the possibility** of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the **potential** that a wrong decision will eventually be corrected or its impact mitigated. **An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction**.

*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 283 (1990) (emphasis added).

Furthermore, the rights recognized in *Cruzan* depended in even larger part on the history governing liberty interests, which derive from the right to bodily integrity, and which extend to a person's right to consent to or refuse medical treatment (subject to exercise of the state's *parens patriae* powers, if exercised with due process). *See id.* at 265-286. This was most strikingly illustrated by the Judge O'Connor concurrence discussing invasive treatments such as feeding tubes, which logical apply with equal force to the invasive treatment of ventilators:

> **Whether or not the techniques** used to pass food and water into the patient's alimentary tract **are termed "medical treatment," it is clear they all involve some degree of intrusion and restraint.** Feeding a patient by means of a nasogastric tube requires a physician to pass a long flexible tube through the patient's nose, throat, and esophagus and into the stomach. **The use of such procedures against a patient's will therefore "burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment**."

*Id.* at 289-90 (emphasis added).

Nothing in *Cruzan* suggests that the constitutional rights acknowledged therein turn on the certainty of medical treatments. Indeed, the Constitution could not be construed in that manner, since rights are not to be construed as requiring satisfaction of an impossible condition. Even in this case, Dr. Duane (even if she is believed) admits that her conclusions regarding terminal illness always come with a substantial "risk of error" (to use the Supreme Court's terminology). While Dr. Duane asserts that treatment of the son would have been futile and that

7

he should be been left to a "natural death," she admits that she has been wrong in approximately **20 percent** of cases in which she has withdrawn treatment. *See* Pls. Appx., Ex. 6 at 177. Conversely, she admits extubations may result in failure up to <u>twenty-five percent</u> of the time, even if **all** parameters are satisfied (which was not the case here).  Pls.' Appx., Ex. 6 at 217

      Even if Dr. Duane believed that the **twenty-five percent** risk of death was acceptable, it was not her choice to make.  Instead, due process required that the choice be left to the Plaintiffs' (as their son's surrogates) or to the state, via its procedures for exercise of due process. Dr. Duane did neither, and she violated due process by unilaterally deciding to extubate, for that reason alone, as set for this section III(A)(1) below.  Furthermore, that decision did not stand alone, but was coupled with a corollary decision to withhold re-intubation, which is a standard part of unsuccessful extubations, as set forth in section III(A)(2).  Finally, although unnecessary to a ruling in Plaintiffs' favor, there is ample evidence for jury to determine that Dr. Duane simply lied with regard to her intent in extubating Plaintiffs' son.  For instance, evidence indicates that her purported reasons were entirely pretextual, and that Dr. Duane fully intended to hasten the death of Plaintiffs' son, exactly as Plaintiffs have alleged.  *See infra* III(A)(3).

       ***1.***    ***Evidence indicates that Dr. Duane violated the Constitution by ordering extubation without the Plaintiffs' informed consent.***

      In this case, the evidence shows that Dr. Duane and other physicians believed that Plaintiffs' son would not recover (although past decisions indicate that she has been wrong about such decisions as much as twenty-percent of the time).  *See* Pls.' Appx., Ex. 6 at 177. Accordingly, from the earliest stages of hospitalization, the hospital treated Plaintiffs' son has having life-threatening conditions and treating ventilation as "life support."  *See, e.g.,* Pls.'

Appx., Ex. 3 at 67 (noting a pastoral meeting to discussed "end of life care" and a "[p]lan of care that is consistent with beliefs"), Ex. 3 at 48, 50 (referring to withdrawal of "life support").[1]

In light of this diagnosis, Dr. Duane pushed for the family to withdraw life support from the earliest stages of her treatment.  In the jargon of JPS's hospital, those decisions involve the terms "trying to allow natural death" or providing "comfort measures" or "comfort care," which is defined as "a transition from trying to keep someone alive at all costs versus transitioning to focus on pain control, anxiety control, and shifting toward a focus on end of life."  *See, e.g.,* Pls.' Appx., Ex. 3 at 55-56,  58, 109, 131;  Ex. 6 at 168, lines 58:22-25 (defining "comfort measure"). This push began at least as early as March 30 (the first full day in the hospital and two days before termination), when Dr. Duane instructed a physician assistant to conduct a family meeting, not to obtain Plaintiff's *consent* to withdrawal of treatment, but so they "understand we can *only move forward wit[h] comfort measures*."  Pls.' Appx.,  Ex. 3 at 65 (emphasis added). At the same time, Dr. Duane made the determination that she "will not code pt [patient]"—with "code" being a term for "do not resuscitate" in the event of cardiac arrest—*before* any medical records indicate the issue had even been discussed with the parents. Pls.' Appx.,  Ex. 3 at 65.

Although Dr. Duane asserts that she made sure the Plaintiffs' fully understood her decision to extubate, her assertions are belied by the testimony of the father, Mr. De Paz Sr., and conflicts in the evidence must be resolved by a jury.  *See* Pls. Appx., Ex A at 16-25.

Furthermore, even accepting Dr. Duane's version of events, the medical records and Dr. Duane's own admissions make clear that the "understanding" was a one-way street, with Dr. Duane advancing her position without even attempting to obtain informed consent to extubate. For instance, the medical records have multiple examples of hospital personnel allegedly asking

---

[1] As alleged in the Amended Complaint, Plaintiffs' son was a Catholic who attended services every week. *See* Pls.' Appx., Ex. 1 at 4, Ex. 2 at 34.

Plaintiffs to "withdraw life support" and begin "comfort measures" instead, with each instance

making clear that Plaintiffs did not wish to withdraw "life support" or start "comfort measures":

- "Family wishes to continued life support," *see* Pls.' Appx., Ex C at 48, 50;

- ". . . [A]waiting family to come to terms with it [futility]," *see* Pls.' Appx., Ex C at 55;

- ". . . [F]amily does not with to pursue comfort measures at this time [less than three hours before the extubation]," Pls.' Appx., Ex. 3 at 55;

- ". . . "[H]oping for a miracle," *see* Pls.' Appx., Ex. 3 at 56;

- "Family believes in miracles and they do not with to stop treatment at this time," *see* Pls.' Appx., Ex. 3 at 56;

- "They do not with to pursue comfort measures," *see* Pls.' Appx., Ex. 3 at 56;

- "They ask for more time," *see* Pls.' Appx., Ex. 3 at 56;

- ". . . [F]amily has a poor understanding of the severity of brain injury[;] they believe a miracle will happen," *see* Pls.' Appx., Ex. 3 at 56.[2]

- "Mother and father wish to meet with chaplain and family before making decisions about comfort care . . . will need re-education often," *see* Pls.' Appx., Ex. 3 at 56;

- "Physical Hopes: 'Not to Die," *see* Pls.' Appx., Ex. 3 at 68.

Furthermore, separate from the medical records, Mr. De Paz Sr. has testified that his

opposition to withdrawal of ventilation—"begging" and "crying . . . not to [disconnect]"—

continued in the presence of Dr. Duane throughout the time that she unilaterally ordered life

support to be withdrawn:

Q. Tell me in your own words everything that you recall Dr. Duane saying that morning to you?

---

[2] Dr. Duane does not believe in miracles, despite acknowledging that she is wrong in her end-of-life evaluations approximately twenty percent of the time. Ex. 6 177. In fact, evidence indicates that she mocked Mr. De Paz, Sr. *during the extubation process*: "***."  ** The Supreme Court is less jaded, not only agreeing that such decisions are beyond the purview of the government, but also acknowledging that miracles can take forms other than divine intervention—such as "advancements in medical science"—if a patient is not subjected to an "erroneous decision to withdraw life-sustaining treatment." *See Cruzan*, ***283.

A. It was about 6:00 in the morning. I was leaning up against by my son, because I had spent the night there with him, when the doctor arrived with some papers, saying that I should sign it for her for the disconnection of my son.

That's when she said -- well, the interpreter, because there was an interpreter nurse --
that I should -- that I should keep waiting for my miracle without the machine, because she had brought with her a disconnection order, that whether I wanted it or not, **she was going to disconnect him**.

That was hard for me. **I was desperate. I was begging her. And I was crying not to do that**. . . .

Pls.' Appx., Ex. 3 at 22 (emphasis added).

Therefore, a jury could determine that Dr. Duane terminated Plaintiffs' son without obtaining their informed consent or otherwise following any due process of law. Indeed, no reasonable jury could do otherwise, as Dr. Duane admits that she never requested Plaintiffs' consent:

Q: . . . Within your conversation with Dad, did you ever tell him that he has a right to object to his son being extubated:

A.  No.

Pls.' Appx., Ex. 6 at 143-144. Likewise, she admits that this was intentional, because she determined that there was no need "to ask permission to extubate"—*i.e.* "it was not a decision that required his parents' consent"—just "like any other patient." *See* Pls. Appx, Ex. 3 at 56, 134

At the very least, the foregoing factual disputes create genuine issue of material fact that must be resolved by a jury, which is the sole arbiter of witness credibility. Accordingly, summary judgment must be denied on this basis alone.

11

### 2. *Evidence indicates that Dr. Duane violated the Constitution by ordering—in advance—that Plaintiffs' son would not be reintubated if extubation was not tolerated.*

Nevertheless, if the extubation decision did not violate due process standing alone, then it certainly did when paired the other half of Dr. Duane's decision, *i.e.* the simultaneous order that the son would not be re-intubated if the extubation was unsuccessful, despite re-intubations being the normal protocol. Under other circumstances, Dr. Duane might have argued that there was insufficient time to re-intubate, but the evidence would not support such an assertion. Instead, she argued that she was prohibited from re-intubating due to a do-not-resuscitate order (DNR).

To the contrary, Dr. Duane's assertion fails for multiple reasons, as evidence indicates that: (1) no such order existed; (2) any such order would have been rescinded, at least as to ventilation, by statements on the morning of extubation (including the Mr. De Paz Sr.'s statements *immediately* before extubation); and (3) would not have applied until the son's heart or breathing actually stopped.

First, evidence indicates that the Plaintiffs' never agreed to any DNR order, or at least not an not an order that applied to mechanical ventilation. All notations in the medical records—which were accepted without question by Dr. Duane and subsequent reviewers—go back to a "family meeting" at approximately 4:00 on March 30th. *See* Pls.' Appx., Ex. 3 at 48. Specifically, the notations say that meeting was attended by both Plaintiffs and that they agreed to a "DNR A." However, that notation was not corroborated by any witnesses, *e.g.,* the chaplain, even chaplains routinely made notes of such meetings. *See* Pls. Appx, Ex. 3 at 48. In contrast, the father has testified that he doesn't even "know what DNRA is," and a jury could determine that they did not give informed consent to a DNR A designation. *See* Pls.' Appx., Ex.

A at 15.   The mother's testimony is more explicit, as she flatly denies that she agreed to any

DNR change.

> Q. Do you know what a DNR is or do not resuscitate
> order is?
>
> A. No.
>
> Q. So you did not agree to change your son's DNR status; is that correct?
>
> A. Yes.
>
> Q. And no one at the hospital explained to you what
> a DNR is?
>
> A. Not to me.
>
> Q. Did anyone ever tell you that they were going to remove your son's breathing
> tube?
>
> A. No.
>
> Q. And that if he has trouble breathing when they remove the breathing tube, then
> they weren't going to put it back in?
>
> A. No one spoke to me.
>
> Q. If they would have told you that in the days before your son passed away, how
> would you have responded?
>
> A. In what way?
>
> Q. Would you have objected to that decision?
>
> A. Yes.

Pls. Appx., Ex. 2 at 38-39.

More importantly, even if the Plaintiffs had ever agreed upon any DNR order that applied

to ventilation, it would have been rescinded by the subsequent communications by Mr. De Paz

Sr. on the morning of his son's death.  In the notes from that time, the background still reference

the 3/30 meeting, but the subsequent highlights of the last 24 hours state that "Family wishes to

continue life support," with no qualification.  Pls. Appx., Ex. 3 at 51.   More importantly, evidence indicates that Mr. De Paz Sr. made clear (to Dr. Duane herself) that he did not want his son removed from a ventilator.

Therefore, if there was ever a DNR order that prohibited re-intubation, these April 1 statements constituted requests for new treatment decisions, and on that date all DNR orders became subject to Texas Health Code section 166.201, *et seq.*, include the provision for revocation of DNR orders in sections 166.040 and .205, as well as the requirement that the "later in time" order controls.  As such, under Texas law, Dr. Duane had no discretion to honor any prior order, if it existed.

More importantly, *Cruzan, et al.*, required Dr. Duane required to effectuate the wishes of the Plaintiffs (or provide alternative due process with notice *and hearing*) at time of the treatment decisions, and by April 1 she had actual knowledge that Mr. De Paz Sr. wanted to continue to the use of a ventilator on his son.  If  DNR had existed at that point under Texas law, then Dr. Duane would have been fully aware that it was unconstitutional to follow it.

Most importantly of all, evidence show that a DNR A order (even if it existed and was still in effect), simply did would not have prohibited the normal course of re-intubation when extubation is unsuccessful. Indeed, that is clear for two different reasons.  First, as already alluded to, DNRs come in different forms, with some preventing only limited acts (such as defibrillation) and other preventing different acts.  Here, evidence from JPS's port-mortem review process indicates that a DNR C allows only comfort care but that a DNR A allows some treatments, that is was unclear why Dr. Duane stopped those treatment, and that "upon extubation [Plaintiffs' son] met intubation criteria" in particular. *See, e.g.,* Pls.' Appx. Ex. D at 109, 112.

14

Second, a DNR order (even if it encompassed intubation) simply has no relevance until a patient "codes," *i.e.* "goes into cardio pulmonary arrest." *See, e.g.,* Def.'s Appx., Ex. D. at 93. Or, put another way, " if someone's heart stops , you do not perform CPR or provide medications that , in layman's terms , essentially jump starts their heart to start beating again." *See* Def.'s Appx., Ex. 6 at **42**.

In contrast, a DNR order does **not** allow a physician to order that a "patient would not be reintubated if he started to decline due to futility of care," yet that is exactly that Dr. Duane did in this case. Pls.' Appx., Ex. 3 at 107; *see also* Ex. 3 at 55 (ordering "will intubate and **not** reintubate as a DNR A") (emphasis added) Ex. 3 at 56 (stating that "pt would **not be reintubated in case he failed**) (emphasis added).

Here, a jury could determine that the DNR created no prohibition against re-intubation and the only prohibition was Dr. Duane's order against re-intubation, *made in advance*. As a preliminary matter, the record does not indicate the Plaintiffs' son had been intubated because he could not breath at all, but because his comatose state limited his breathing and reduced his oxygen levels before intubation. *See* Pls. Ex. 3 at 48 (noting increased ventilation due to desaturated oxygen levels). The same result occurred upon extubation, as the medical records state that Plaintiffs' son became "hypoxic" within minutes after extubation. *See, e.g.,* Pls. Appx., Ex. 3 at 48, 50, 58. 60. More specifically, his oxygen levels dropped to 33% within one minute and 7% within two minutes. *See* Pls. Appx., Ex. 3 at 79, 80, 84; However, he was still breathing at that point, and his oxygen levels actually increased over the next eight minutes, but not enough to prevent cardiac arrest, which did not occur until ten minutes after extubation, at the earliest. *See* Pls. Appx., Ex. 3 at 79, 80, 84. Accordingly, there was nothing that prevented reintubation (which Dr. Duane admits is standard procedure in failed extubation), apart from Dr. Duane's

order prohibiting it.  *See* Pls. Appx., Ex. 3 at 109 (stating that patient "upon extubating me intubation criteria"); Ex. 6 at 185 (admitting that reintubation would have been standard procedure apart from the alleged DNR order).  And the staff was ready, willing, and able to reintubate, but was prevented from doing so by Dr. Duane's order.  *See,* Pls.' Appx., Ex. 5 at 107.

### 3.     Although unnecessary to establish a constitutional violation, evidence indicates that Dr. Duane unilateral decision to extubate (and not re-intube) was intended to hasten the death of the Plaintiffs' son, without consent.

Finally, since due process is violated by the very act of a unilateral decision by a physician, Plaintiffs need not prove that Dr. Duane actually intended for the son to die. However, there is ample evidence for a jury to support such a finding.  While Dr. Duane asserts that she extubated for the son's benefit (to prevent risk of a tracheostomy),[3] a jury could determine that her purported reasons are pretextual when compared to *a twenty-five percent risk of immediate death*, particularly since there is no discussion of a tracheostomy in the medical records (and certainly no discussion of an imminent tracheostomy decision that had to be made in less than 25 minutes on Easter morning.  *See* Pls.' Appx., Ex. 9 at 223.

Instead, a jury could focus on other evidence in the record indicating that she intended to "allow a natural death" and would "only move forward wit[h] comfort measures comfort measures," despite the refusal of the Plaintiffs to agree to that course of treatment.  *See, e.g.,* Pls.' Appx.,  Ex. 3 at 55-56,  58, 65, 109, 131;  Ex. 6 at 168, lines 58:22-25 (defining "comfort measure").  Or a jury might decide that Dr. Duane simply wanted  prevent a "long ICU stay" in

---

[3] This explanation does not appear in the record provided by Dr. Duane in this action, but that was the purported reason provided in a post-mortem review of her actions:

> This would achieve two things: 1. If he passed, avoid a tracheostomy in a patient with his head injury and 2- if he failed, allow us to honor his DNR status.

*See* Pls.' Appx., Ex. 3 at 114.

her department, or that she wanted to leave early to attend Easter Mass. *See* Def.'s Appx., Ex. D at 85; Pls.' Appx., Ex. 9 at 223.

In any event, Dr. Duane's purported reason is further controverted by other facts, such as the timing of the decision, since medical records indicate that Dr. Duane had *already* decided to extubate (and not to reintubate) *before* receiving notice of the parameters on which her decision was purportedly based.  Specifically, Dr. Duane bases her decision primarily on receiving "RSBI" number that allowed her to justify extubation.  However, those numbers were not provided until  (depending on which medical record is believed):  (1) 6:08am, the exact time extubation started; or (2) 5:43am, twenty five minutes before.  *See* Pls.' Appx., Ex. 3 at 67.

In contrast, as early as March 29, Duane stated that should would "not code" the patient, *before* even a purported DNR order had been made. Pls.' Appx., Ex. 3 at 65. The entries at 3:23 on April 1 (two hours before extubation) then seem to indicate that she had already decided to extubate.  Pls.' Appx., Ex. 3 at 56.  But most damning, statements of Dr. Stephenson indicate that she had made the decision the *previous day*, and then misrepresented her communications with him to cover up that fact.  Specifically, Dr. Duane relies heavily on the assertion that she conferred with Stephenson and received agreement to extubate at some point within the 25 minutes between receiving the RSBI number and beginning the procedures.  Pls.' Appx., Ex. 3 at 48.  However, Stephenson subsequently stated to a nurse that the Dr. Duane had talked to him the day before and had told him the patient has already passed weaning parameters, a day before Dr. Duane received the RSBI numbers:

> Chaplain and I called Dr. Stephenson per chaplain's request to ask why he had been extubated and inquire about events that had transpired. Dr. Stephenson said he was called in as a favor to pronounce the pt and speak with family. He was not aware that the pt had just been extubated minutes prior to death. Duane had told him that the pt had passed weaning parameters yesterday. So Stephenson's understanding was that the pt has been extubated yesterday., that he thought the

patient had been extubated the day before, and that he was unaware that the patient had only been extubated minutes before

Pls. Appx., Ex. D at 107.

Furthermore, Dr. Duane administered fentanyl before extubation. Although she attempts to justify that decision, evidence of hospital policy indicates that fentanyl is only used for extubations that are intended for complete withdrawal of life support, *i.e.* comfort measures only, exactly has Plaintiffs have alleged.

In addition, Dr. Duane's intent is further evidenced by a different end-of-life decision made without consent. As noted already, medical records indicate that Dr. Duane intended to let Plaintiff's son die a "natural death." Pls.' Appx., Ex. 3 at 55. More particularly, however, that statement was made in connection with a decision not to provide a feeding tube—a decision that is plainly within the scope of *Cruzan* but that never appears in the discussion of Plaintiffs' consent in the medical records.

The questions in this case are not questions regarding the objective reasonableness, but are questions of intent—whether Dr. Duane intentionally or knowingly made medical decisions that were required to be made by either the patient's surrogate or by the state (with due process). These issues are not issues that are subject to expert testimony, but are squarely within the province of the jury.

Therefore, whether or not Dr. Duane actually *intended* a death to occur, she at least acted with intentional disregard of the risk, and she certainly intended to take the entire decision-making process into her own hands. Or at least a jury could so determine. According, summary judgment must be denied.

**B.    Dr. Duane has failed to establish that she is entitled to summary judgment on the element of damages.**

Next, Dr. Duane asserts that Plaintiffs cannot prove actual or punitive damages.  To the contrary, the evidence already discussed is sufficient to deny summary judgment on this issue.

When Section 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts. *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986).   But that does not mean the issues are identical, and one of the difficulties in evaluating due process cases Section 1983 cases with tragic outcomes is that in most other cases, the condition of the decedent prior to the incident is not in issue. Here, there is no doubt that Mr. De Paz's condition and prognosis was poor prior to the alleged incident made the basis of this lawsuit. However, the broad construction of Section 1983 and the Court's interpretation of same has allowed for both general compensatory damages as well as punitive damages.

With respect to compensatory damages, Mr. De Paz's father was a direct bystander to his son's death and will be able to recover mental anguish damages for witnessing the death of his son. Additionally, the Texas wrongful death scheme allows for the survival Plaintiffs, Berman De Paz's parents, to recover for the loss of love, companionship, affection, comfort, society, and counsel. The testimonial evidence for these various elements of damages will come from the parents' perspective and will encompass their state of mind regarding the beliefs and hopes regarding their son's chances at recovery.

As to punitive damages, the Fifth Circuit has long recognized that punitive damages are essential feature in malicious deprivations of constitutional rights. Thus, even when the court has refused to allow punitive damage (*i.e.* from municipalities), it did so in part because damages

levied ***directly against the offending officials serve as a more effective deterrent***.  *See Webster*

*v. City of Houston*, 689 F.2d 1220, 1236 (5th Cir. 1982)(emphasis added).

Therefore, in a Section 1983 action, a plaintiff may be awarded punitive damages if "the

defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461

U.S. 30, 56 (1983); *see also Hale v. Fish*, 899 F.2d 390, 404 (5th Cir. 1990).  As to the second

option, "a post-*Smith* decision [of] the Supreme Court provided a less complex definition, stating

that the standard 'at a minimum, require[s] recklessness in its subjective form.'" *Kohler v.*

*Johnson*, 396 F. App'x 158, 162 (5th Cir. 2010) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S.

526, 536 (1999)).

In other words, the question of damages turns on intent. As shown above, a jury could

determine that Dr. Duane's acts were motivated by evil intent, but even if not, there is more than

sufficient evidence for a jury to determine that she was subjectively reckless in violating the right

to due process.  Accordingly, the issue must be left to the jury, and summary judgment should be

denied.

### C.    Dr. Duane has failed to show that she is entitled to summary judgment on Plaintiffs' § 1983 claim as a matter of law.

Finally, Dr. Duane assert that she is entitled to qualified immunity as a matter of law.  To

the contrary, she has failed to establish that she is within the class of persons entitled to claim

that immunity, that her actions involved the type of discretion needed to invoke the privilege, or

that the evidence supports a claim of qualified immunity.  At the very least, the evidence is

sufficient to raise fact issues on each point.

**1.     Dr. Duane has failed to demonstrate as a matter of law that she is a person who can invoke the affirmative defense of qualified immunity.**

First, Dr. Duane has failed to establish as a matter of law she is in the category of persons who are entitled to assert qualify immunity, despite being employed by a private corporation, based on the Fifth Circuit's decision in *Perniciaro*.  *See* Br. Supp. MSJ [Dkt. 67] at 4-6 (citing *Perniciaro v. Lea*, 901 F.3d 241 (5th Cir. 2018)).  To the contrary, the limited facts are more analogous to the *Sanchez* decision.  *Sanchez v. Oliver*, 995 F.3d 461 (5th Cir. 2021).  In any event, the Court previously determined (correctly) that the facts of Dr. Duane's employment are not identical to either, and resolution therefor requires full examination of the factors discussed in the Supreme Court's *Richardson* and *Filarsky* opinions.  *See* Order signed March 11, 2022 [Doc. 75] (citing, *e.g., Richardson v. McKnight*, 521 U.S. 399 (1997).

Even where private individuals are subject to liability under 42 U.S.C. § 1983 for actions taken under color of law, that does not necessarily mean they are entitled to invoke the defense of qualified immunity.  *See generally see Wyatt v. Cole,* 504 U.S. 158, 168-69 (1992).  "Whether private actors may assert qualified immunity depends on:

 (1) "principles of tort immunities and defenses applicable at common law around the time of § 1983's enactment in 1871"; and

(2) "the purposes served by granting immunity."

*Sanchez,* 995 F.3d at 466.  Both factors involve fact-specific inquiries.  *See generally Wynn v. Harris Cty*., No. 4:18-CV-04848, 2021 U.S. Dist. LEXIS 160553, *13-19 (S.D. Tex. 2021).

Here, Dr. Duane has not established either factor as a matter of law.  As to the first factor, the Court must determine whether there is a "firmly rooted tradition of immunity applicable to privately employed medical professionals;" more specifically, the "key to untangling" this issue "is the nature of the claims against [the Defendant].  *Sanchez v. Oliver*, 995 F.3d 461, 468-69

(5th Cir. 2021).  Thus, in *Sanchez*, the Fifth Circuit held that there was no tradition of immunity to physicians in the correctional context, but the court's reasoning was "not so limited." *See* Order [Doc. 75] at 12 n.4.  Instead, the court's decision was based on the distinction between claims based in negligence (which involved some level of immunity at common law) and claims based in recklessness or intent.  *See Sanchez, 995 F.3d* at 468.  Since § 1983 claims ordinarily require a showing recklessness, the court held that there was no firmly rooted tradition of immunity for § 1983 claims.  *See id.* at 468-69.  Thus, Dr. Duane's argument fails on the first element.

Furthermore, Dr. Duane is also mistaken as to the second factor, as each of the purposes for granting immunity weigh against its application in this case.  First, and most importantly, Dr. Duane has failed to establish that there were would be a substantial risk of private physicians exercising "unwarranted timidity" if qualified immunity were not applied.  *See* Sanchez, 995 F.3d at 469.  As a preliminary matter, some courts  have recognized that the very nature of a physician's role counsels against a finding of unwarranted timidity:

> Concerns of "unwarranted timidity" are also significantly less pressing for medical professionals—who face potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough—than for police officers and prison guards, who rarely face liability for, as an example, not using enough force.

*Tanner v. McMurray*, 989 F.3d 860, 869 (10th Cir. 2021)*, cited with approval by Gasca v. Lucio*, No. 1:20-cv-160, 2021 U.S. Dist. LEXIS 176051, at *20 (S.D. Tex. 2021).

Nevertheless, assuming that the timidity factor could weight in favor of qualified immunity in some instances, Dr. Duane has not established it in this case.  Qualified immunity may be  necessary to prevent "timidity" when institutional rules and regulations— primiarily "civil service rules"—limit the incentives or the ability of individual departments or supervisors

flexibly to reward, or to punish, individual employees." *Richardson v. McKnight*, 521 U.S. 399, 410-11 (1997).  In contrast, when private entities are "systematically organized to perform a major administrative task" and do so "independently, with relatively less ongoing direct state supervision," then ordinary marketplace pressures provide incentives against "unwarranted timidity."  *Id.* at 409.  In contrast, private firms usually have more latitude to "flexibly and creatively use rewards and punishments to encourage employees to strike the right balance between vigor and caution." *Id.* at 409-10.  Likewise, when private firms act "independently, with relatively less ongoing direct state supervision," then "ordinary marketplace pressures" will typically "encourage vigorous performance" and prevent "unwarranted timidity."  *Id.*

In this case,  Dr. Duane contends that Acclaim is not a large, for-profit entity, but there is not reason that it need be, and other courts have declined to apply qualified immunity to physician employed by non-profit corporations.  *See, e.g., McCullum v. Tepe,* 693 F.3d 696, 704 (6th Cir. 2012), *cited with approval by Sanchez,* 995 F.3d at 467; *Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163, 1169 (10th Cir.2005).   Instead, the critical question is whether it is a private corporation with the "incentive" or "ability" to adequately "reward," or "punish, individual employees" so as to avoid unwarranted timidity, and the record demonstrates it has both the incentive *and* ability to do so.

First, the Court has already noted that Acclaim operates with limited supervision, makes its own hiring decisions (subject to consent that may not unreasonably be withheld, operates for an unidentified "Term," and is subject to a "risk" of termination.[4]  *See* Order [Doc. 75] at 12-13.

---

[4] As with the original motion for summary judgment, the length of the "Term" does not appear in the record, and upon information and belief, has never been provided in the disclosures or discovery. Furthermore, while Dr. Duane contends that the JPS would never terminate the agreement with Acclaim, the agreement plainly allows JPS to do so, which creates as "risk" of "replace[ment]" by a ready competitor" if such replacement would better service the citizens of Tarrant County.  *See, e.g. Richardson*, 521 U.S. at 409-10.

Furthermore, the record shows that Acclaim has flexibility to make its own termination

decisions, with only "notice" to JPS and no requirement for JPS's approval.  *See* Def.'s Appx.

[Doc. 81],  Ex. C at 175 § 3.4.4.  Most significantly, the agreement expressly "waives" the

"institutional rules and regulations" (*e.g.* civil service rules) that inhibit government employers:

> . . . Any right a Provider may otherwise have to any hearing or appeals procedure
> prior to termination of Medical Staff membership and/or clinical privileges
> pursuant to the Medical Staff Bylaws, or the bylaws or policies of District, the
> Healthcare Quality Improvement Act of 1986 or any other state or federal statute,
> regulation or judicial decision are hereby waived. In the event of any conflict
> between the terms of this Agreement and the Medical Staff Bylaws or the bylaws
> or policies of District, this Agreement will control.

*See* Def.'s Appx. [Doc. 81],  Ex. C at 175 § 3.4.4 (emphasis added).

Likewise, the record confirms the Court's suspicions that Acclaims agreements provide

for indemnity and insurance that would prevent unwarranted timidity.  For instance, the

agreement with JPS provides that JPS may provide insurance to its current and former directors,

such as Dr. Duane, and that it will provide indemnity to them:

> Chapter 8 of the TBOC permits the Corporation to indemnify its present and
> former Directors and officers to the extent and under the circumstances set forth
> therein and herein. The Corporation hereby elects to and does hereby indemnify
> all such persons to the fullest extent permitted or required by such Article
> promptly upon request of any such person making a request for indemnity
> hereunder. Such obligation to so indemnify and to so make all necessary
> determinations required by that Article may be specifically enforced by resort to
> any court of competent jurisdiction. Further, the Corporation shall have the power
> to purchase and maintain at its expense insurance on behalf of such persons to the
> fullest extent permitted by applicable law, whether or not the Corporation would
> have the power to indemnify such person under the foregoing provisions. The
> Corporation shall also have the power to and shall pay and reimburse the
> reasonable expenses of such persons covered hereby in advance of the final
> disposition of any proceeding to the fullest extent permitted by Chapter 8 of the
> TBOC and subject to the conditions thereof and hereof.

Def.'s Appx. [Doc. 81],  Ex. C at 164 Art. XI (emphasis added).  Similarly, the agreement

requires liability insurance for all physicians. See Def.'s Appx. [Doc. 81],  Ex. C at 177 § 3.9.3.

24

It may be that this insurance is to be provided at the physician's expenses (Dr. Duane does not include any section 10.1 or schedule in the record, so it is impossible to tell), but regardless, the requirement for liability insurance weighs against any finding of unwarranted timidity.

Finally, Acclaim's agreement with JPS does not merely waive limitations on physician discipline, it also avoids any civil service limitations on compensation.  In other words, Acclaims physicians are not subject to a governmental pay scale but may—indeed must—be paid at market rates:

> Contractor's compensation of Physicians shall at all times be consistent with fair market value for the services provided.

Def.'s Appx. [Doc. 81],  Ex. C at 175 § 3.8.2.  Therefore, the market—the marketplace for physician services—provides an incentive for Acclaim's physicians to perform their services without any unwarranted timidity, just like the employees of any other private employer.

Therefore, the first factor, standing alone, requires denial of qualified immunity. However, the other facts also weigh against Dr. Duane's right to invoke qualified immunity in this case.  The record does not establish the second factor, as nothing in Acclaim's structure would "deter qualified candidates from public service."  *Sanchez*, 995 F.3d at 470.  As a "private firm," Acclaim is not bound by a civil service pay scale, but can offset the risk of litigation and liability with "higher pay or extra benefits." higher pay or extra benefits.  *Richardson*, 521 U.S. at 412.  Indeed, Acclaim *must* do so, since it is contractually obligated to pay "fair market value for the services provided." Def.'s Appx., Ex. C at 175 § 3.8.2.  Nor is there any heightened risk of liability by employment at Acclaim *vis a vis* other private firms.  To the contrary, employment at a quasi-public non-profit carries *less risk* under Texas law, by statute, than employment as an ordinary private employee.  Finally, the record does not support the contention that physicians at Acclaim "work in close proximity to close coordination with government employees who may

leave them holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity."  In fact, Dr. Duane has not even cited to record evidence that Acclaim's physician work "alongside public employees," since Dr. Duane cites no evidence that JPS separately employed its own physicians at the relevant time.  Rather, she admits that "[o]n the date of the events in question, Acclaim employed the physicians who provided services to patients of the Tarrant County Hospital District"),  Def.'s Appx., Ex. D at 85 ¶ 7, *see also* Def.'s Appx., Ex. L(D) at 182 (stating that "Acclaim provides the professional medical services to JPS

Patients").

Finally, the third element is the least significant, and "risk of distraction alone cannot be sufficient grounds for an immunity." *Davis v. Buchanan Cty*., 11 F.4th 604, 622 (8th Cir. 2021).  More importantly, Dr. Duane provides not evidence to support this element, as she simply repeats the basis principles, without discussing their application to the record evidence.  Thus, there is not reason to think that Acclaim's physicians would be any more distracted than their counterparts at a purely private hospital.  To the contrary, multiple courts have recognized that physician and other medical personnel "may be uniquely equipped to handle these litigation distractions":

> Doctors and nurses in private practice generally face a constant threat of claims leading to litigation. Facing constitutional tort claims with a higher burden of proof is not any more daunting or distracting than dealing with the medical malpractice claims with which they are familiar.

*Davis*, 11 F.4th at 622 (quoting, *e.g.,*  Tanner, 989 F.3d at 870) (internal quotation marks omitted).  "Additionally," an employer's legal team may 'mitigate the impact of litigation' by bearing the brunt of legal work," which has been the case here (even though Dr. Duane is no longer employed by Acclaim).  *See id.* (quoting *Sanchez,* 995 F.3d at 472).

Therefore, Dr. Duane has not established that any of the three factors weigh in favor of allowing her to assert qualified immunity, much less all three. Accordingly, Dr. Duane's qualified immunity arguments fail at the outset, without regard to any other issues.

### 2. Dr. Duane has failed to invoke the defense, as she has not demonstrated as a matter of law that she was acting within the scope of discretionary authority.

Nevertheless, even if Dr. Duane had shown she could invoke qualified immunity, she has not established the threshold facts needed to do so. For at least four decades, the Fifth Circuit has recognized that the qualified-immunity (sometimes called "good-faith immunity)[5] requires a defendant to "show that the conduct in question occurred while he was acting 'in his official capacity and within the scope of his discretionary authority'" *Cronen v. Tex. Dep't of Human Servs.*, 977 F.2d 934, 939 (5th Cir. 1992) (quoting *Garris v. Rowland*, 678 F.2d 1264, 1271 (5th Cir.1982)). While this threshold burden is rarely discussed in the case law (because it is rarely in dispute), it remains an essential requirement for establishing qualified immunity. *See, e.g., Cherry Knoll, L.L.C. v. Jones,* 922 F.3d 309, 318 (5th Cir. 2019) (*quoting Cronen,* 977 F.2d at 939. If this burden is not met, then the burden never shifts to the plaintiff to plead or prove (depending on the stage of the proceedings) that the conduct violated an established constitutional right. *See id.*

In this case, Dr. Duane does not discuss this element of qualified immunity, and the evidence does not establish that she had discretion to make the decisions that are at issue. Here, Dr. Duane arguably was acting within authority granted *by Acclaim and JPS*, but not within discretionary authority *allowed by law*.

---

[5] *See, e.g., Davis v. Scherer,* 468 U.S. 183, 194 (1984). Initially, the "good-faith immunity" test involved both a subjective and objective component, but the subjective component has (in most cases) been eliminated by from the analysis. *See id.* at 194-97.

For the reason discussed in Section III(A)(1), Dr. Duane had not authority to make a unilateral decision to extubate, or at least a jury could so determine.  Furthermore, as discussed in Section III(A)(2), Dr. Duane certainly had to authority to make a corollary decision not to re-intubate after extubation.  And, as discussed in Section III(A)((3), Dr. Duane could never had had discretion to make either part of the decision if she intended to cause the death of Plaintiffs' son.  In any event, the issues stand or fall on the jury's determination of the substantive claims.  If the jury determines that Dr. Duane did not violate the protections of due process, then qualified immunity will be irrelevant. But, if the jury determine that she violated those rights, then the same facts will nevertheless demonstrate that she never had discretion to make the decisions at issue in the first place.

### 3.     Even if Dr. Duane has invoked the defense of qualified immunity, she has failed to establish the defense as a matter of law.

Because Dr. Duane has failed to demonstrate that she was acting within the scope of her authorized discretion, the burden does not shift to Plaintiffs to show that she violated a clearly established right.  Nevertheless, if the Court could consider the issue, the already-discussed evidence is sufficient to establish a violation of clearly established rights.[6]

The relevant principles have already been discussed in a prior motion for summary judgment regarding qualified immunity (and an order denying that motion).  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks omitted).  But "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  *Id.*

---

[6] Although the issue is raised by motion for summary judgment, rather than in one of the prior motions to dismiss, Dr. Duane does not challenge the ability of Plaintiffs to support their allegations with evidence. *See* Fed. R. Civ. P. 56(c)(1)(B).

Therefore, while "earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Villarreal v. City of Laredo*, No. 20-40359, 2021 U.S. App. LEXIS 32505, at *8 (5th Cir. Nov. 1, 2021) (citing *Hope*, 536 U.S. at 741). Instead, "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (brackets in original) (quoting *Hope*, 536 U.S. at 741). Thus, a "***general constitutional rule*** already identified in the decisional law may apply with ***obvious clarity*** to the specific conduct in question, even though the very action in question has [*not] previously* been held unlawful.'" *Id.* (bracket and italics in original, bold added) (quoting *Hope*, 536 U.S. at 741); *accord Taylor v. Riojas,* 141 S. Ct. 52, 53-54 (2020).

As discussed on the prior motion for summary judgment based on qualified immunity, the acts are "obvious[ly]" subject to the "general constitutional rules" that are inherent in the Fourteenth Amendment itself and in decisions such as the *Cruzan*. If a jury determines that Dr. Duane did not violate those rules, then so be it. But, if the jury determines that the Dr. Duane did violate due process for the reasons discussed in sections A(1), (2), or (3) above, then the same factual resolutions will demonstrate she was on notice that her conducted would violate the law. In either event, the issue turns on the factual resolutions of the jury, and summary judgment must be denied.

### D. Alternatively, if the motion is not denied, the Court should exercise its discretion to deny summary judgment and proceed to trial.

Alternatively, even if the Court believes that summary judgment is appropriate on the current record, it should nevertheless deny summary judgment to resolve the issues after a trial on a full record. It is well settled that a district court has discretion—sometimes termed a "negative discretionary function"—"where there is reason to believe that the better course would

be to proceed to a full trial." *Pasco v. Knoblauch*, 223 F. App'x 319, 322 n.9 (5th Cir. 2007); *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 534 (5th Cir. 2012) (adopting *Firman v. Becon Constr. Co.,* 789 F. Supp. 2d 732, 739 (S.D. Tex. 2011)); *Marcus v. St. Paul Fire & Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir. 1981) (stating that a district judge can perform this 'negative discretionary function' and deny a Rule 56 motion that may be justifiable under the rule, if policy considerations counsel caution").

These principle have particular force where summary judgment terns on a question of "intent" or where a decision would involve questions of law that might be rendered moot by a jury's factual decision or that would be better decided on a full record after trial. *See generally Pasco*, 223 F. App'x at 322 ("conclud[ing] that the better course is for a jury to resolve the question of [a defendant's] intent after hearing all of the evidence, rather than for the court to decide it summarily").

This case involves both issues. As discussed above, a critical question is the intent of Dr. Duane and that question should be resolved after "hearing all of the evidence" rather than decided summarily. *Id.* Similarly, this case has already been the subject of an one complete appear and is currently the subject of a second appeal on a partial judgment. It is not unreasonable to think that the instant motion will also be the subject of an appeal, whatever the result, and the ultimate resolution of the legal issue should be decided on a full record. Indeed, *even if* the Court were inclined to believe that a decision could be reached as a matter of law, it would be more efficient to reach that decision on a directed verdict after a full trial, so that both this Court and the appellate court have then benefit of a full record. Accordingly, even if the Court believes summary judgment is appropriate on the current record, the Court should exercise its "negative discretion" to deny summary judgement and proceed to a full trial.

IV. **CONCLUSION**

For the foregoing reasons, the motions to dismiss should be denied, and the case should

proceed to a trial on the merits.

Dated: August 31, 2022

*Jackson Davis*

JACKSON DAVIS (TX Bar No. 24068540)
STRECK AND DAVIS LAW
555 S. Summit
Fort Worth, Texas 76104
(817) 332-3117
(817) 549-8898 FAX
jackson.davis@streckdavislaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief will be served on all counsel of record via the

Court's electronic filing system on August 31, 2022.

*Jackson Davis*